Constance Jean Hollen ESKRA, Individually and on behalf of all others similarly situated, Plaintiff,

v.

Rogers C. B. MORTON, Individually and as Secretary of the Interior, et al., Defendants.

No. 72-C-428.

United States District Court, W. D. Wisconsin.

Aug. 1, 1974.

Peter J. Sferrazza, Wisconsin Judicare, Wausau, Wis., for plaintiff.

James M. Bablitch, Asst. U. S. Atty., Madison, Wis., for defendants.

## OPINION AND ORDER

JAMES E. DOYLE, District Judge.

Plaintiff seeks review of a probate decision of the Board of Indian Appeals of the Department of the Interior entered September 27, 1972. Jurisdiction is claimed under the Administrative Procedure Act, 5 U.S.C. §§ 701–706; 25 U.S. C. § 345; and 28 U.S.C. § 1361. Presently before the court are cross motions for summary judgment. Both parties agree to the material facts as found in the administrative decision, Estate of Florence Bluesky Vessel, 1 IBIA 312, 79 I.D. (Sept. 27, 1972).

On the basis of the entire record herein, I find that there is no genuine dispute as to the material facts set forth

hereinafter in this opinion under the heading "Facts."

## Facts

 Florence Bluesky Vessel was an unallotted member of the Lac Courte Oreilles Chippewa Indian Tribe who died intestate at Hayward, Wisconsin, on November 2, 1964. At death, she possessed trust or restricted real property [1] in the State of Wisconsin. She was not survived by children, spouse, or parents. Her surviving collateral relatives included the daughters of her predeceased niece Florence Thayer Hollen. These grandnieces were Faye Elizabeth Hollen Gable, Ilene Loretta Hollen, and the plaintiff, Constance Jean Hollen Eskra. Constance was an illegitimate child of Florence Thayer and Robert Kliebert born prior to Florence Thayer's marriage to Knofel Hollen. Florence Thayer was never married to Robert Kliebert. Faye and Ilene were the legitimate children of Knofel Hollen and Florence Thayer Hollen.

There are between 300 and 500 estates involving interests in Indian Trust property located in Wisconsin which have not been administered or probated by the Department of the Interior, and in which the decedents died before April 1, 1971. Of the said estates, a number involve illegitimate heirs who would inherit through their mothers, but for the effect of Wis.Stat. § 237.06 (1969) ; however, what this number is cannot be determined presently.

## OPINION

 Faye and Ilene each received a 1/30th share of their great-aunt's estate. Constance Eskra was barred from any share in the estate because of 25 U.S.C. §§ 348, 464 which incorporate by reference Wisconsin's Heirship of Illegitimates Statute, Wis.Stat. § 237.06 (1969).[2] Though § 237.06 has been repealed,[3] it governs plaintiff's claim to a share of her great aunt's estate since it was the law in effect at Florence Vessel's death in 1964. § 237.06 allowed an il-

---

[1]. The distinction between trust property and restricted property is explained in United States v. Bowling, 256 U.S. 484, 486–487, 41 S.Ct. 561, 562, 65 L.Ed. 1054 (1921) :

"Before coming to the acts under which the Secretary of the Interior proceeded, it will be helpful to refer to the modes, long in use, by which Indians are prevented from improvidently disposing of allotted lands. One is to issue to the allottee a written instrument or certificate, called a trust patent, declaring that the United States will hold the land for a designated period usually 25 years, in trust for the sole use and benefit of the allottee, or, in case of his death, of his heirs, and at the expiration of that period will convey the same to him, or his heirs, in fee, discharged of the trust and free of all charge or incumbrance. The other is to issue at once to the allottee a patent conveying to him the land in fee and imposing a restriction upon its alienation for 25 years or some other stated period. While alienation is effectually restricted by either mode, allotments under the first are commonly spoken of as trust allotments and those under the second as restricted allotments."

The regulations governing Indian probate issued by the Secretary of the Interior use "trust property" to include both types of ownership, 43 C.F.R. § 4.201(m), and I will follow that practice in this opinion.

[2]. "237.06 Heirship of illegitimates

Every illegitimate child shall be considered as heir of the person who shall, in writing signed in the presence of a competent witness, have acknowledged himself to be the father of such child or who shall be adjudged to be such father under the provision of ss. 52.21 to 52.45, or who shall admit in open court that he is such father, and shall in all cases be considered as heir of his mother, and shall inherit his or her estate, in whole or in part, as the case may be, in the same manner as if he had been born in lawful wedlock ; *but he shall not be allowed to claim, as representing his* father or *mother 'any part of the estate* of his or *her kindred, either lineal or collateral*, unless before his death he shall have been legitimated by the marriage of his parents in the manner prescribed by law." (Emphasis added.)

[3]. Wis.Stat. § 237.06 (1969) was replaced by Wis.Stat. § 852.05 (1971). The new statute allows an illegitimate child "to take in the same manner as a legitimate child by intestate succession from and through . . . his mother." It is applicable to deaths occurring on and after April 1, 1971.

legitimate child to share equally with legitimate children in the estate of her mother or acknowledged father but barred her from any claim through her parents in the estates of lineal or collateral relatives of her mother or acknowledged father. This section was made applicable to the Vessel estate by 25 U.S.C. §§ 348, 464 which govern descent and partition of Indian trust land and which incorporate by reference the inheritance laws of the state where the land is situated.[4]

██ Plaintiff claims that the failure to treat her equally with her half sisters in the distribution of the estate because of her illegitimate birth denies her the equal protection of the laws. Since Wis.Stat. § 237.06 applied to Constance only as incorporated by reference in 25 U.S.C. §§ 348, 464, it must be viewed in the present context as federal law. Joines v. Patterson, 274 U.S. 544, 549, 47 S.Ct. 706, 71 L.Ed. 1194 (1927). Although the equal protection clause of the Fourteenth Amendment is not applicable to federal law, the concept of equal protection is encompassed in the due process clause of the Fifth Amendment.

Johnson v. Robison, 415 U.S. 361, 94 S. Ct. 1160, 39 L.Ed.2d 389 (1974); Shapiro v. Thompson, 394 U.S. 618, 642, 89 S. Ct. 1322, 22 L.Ed.2d 600 (1969); Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

### *Jurisdiction*

The determination of the heirs to the Vessel estate was made under the authority granted the Secretary of the Interior by § 1 of the Act of June 25, 1910, 25 U.S.C. § 372.[5] The material portion of § 372 provides:

"When any Indian to whom an allotment of land has been made, or may hereafter be made, dies before the expiration of the trust period and before the issuance of a fee simple patent, without having made a will disposing of said allotment as hereinafter provided, the Secretary of the Interior, upon notice and hearing, under such rules as he may prescribe, shall ascertain the legal heirs of such decedent, and his decision thereon shall be final and conclusive."

██ Plaintiff contends that the finality clause of § 372 does not preclude this

---

4. 25 U.S.C. § 348 provides in part:

"Upon the approval of the allotments provided for in sections 331–334 of this title, by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the State or Territory where such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever: *Provided*, That the President of the United States may in any case in his discretion extend the period."

25 U.S.C. § 464 provides:

"Except as provided in sections 461, 462, 463, 464, 465, 466–470, 471–473, 474, 475, 476–478, and 479 of this title, no sale, devise, gift, exchange, or other transfer of

restricted Indian lands or of shares in the assets of any Indian tribe or corporation organized hereunder, shall be made or approved: *Provided, however,* That such lands or interests may, with the approval of the Secretary of the Interior, be sold, devised, or otherwise transferred to the Indian tribe in which the lands or shares are located or from which the shares were derived or to a successor corporation; and in all instances such lands or interests shall descend or be devised, in accordance with the then existing laws of the State, or Federal laws where applicable, in which said lands are located or in which the subject matter of the corporation is located, to any member of such tribe or of such corporation or any heirs of such members."

5. The Secretary has established a two tier administrative process in Indian probate. Initial determinations are made by a Hearing Examiner. Appeals may be taken from an Examiner's decision to the Board of Indian Appeals. The decision of the Board is the final decision of the Secretary. 43 C.F. R. § 4.200 et seq.

court's jurisdiction under 25 U.S.C. § 345; 28 U.S.C. § 1361 (mandamus); or 5 U.S.C. §§ 701–706 (the Administrative Procedure Act). Defendants concede that jurisdiction is present. However, subject matter jurisdiction cannot be conferred by waiver. I must determine whether Congress has given this court power to review the decision of the Secretary.

■■ Read literally, 25 U.S.C. § 345 appears to grant the district courts jurisdiction over every action by an Indian which seeks to establish a claim to land under any federal law.[6] § 345 has been construed, however, as limited to challenges to original allotments of Indian trust land. It does not govern "disputes concerning the heirs of one who held a valid and unquestioned allotment." First Moon v. White Tail, 270 U.S. 243, 245, 46 S.Ct. 246, 70 L.Ed. 565 (1926). Thus, it does not provide jurisdiction in the present matter.[7]

■ Mandamus under 28 U.S.C. § 1361 is an extraordinary remedy employed only where no other adequate remedy is available. Accordingly, I will first inquire whether jurisdiction is present under the Administrative Procedure Act (hereinafter the "APA").

5 U.S.C. §§ 701, 702 (§ 10 of the APA) provide:

". . . [E]xcept to the extent that —(1) statutes preclude judicial review. . . .

. . . . . .

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

Plaintiff is entitled to review under these provisions unless the finality clause of § 372 precludes judicial review to the extent of barring examination of the constitutionality of the statutes on which the Secretary relied.

Simmons v. Eagle Seelatsee, 244 F. Supp. 808 (E.D.Wash.1965) (three-judge court), aff'd mem. 384 U.S. 209, 86 S.Ct. 1459, 16 L.Ed.2d 480 (1968), held that the finality clause did not bar review of the constitutionality of a federal statute on which the Secretary had relied in denying certain claimants shares in the estate of a Yakima Indian. The claimants sought to challenge the constitutionality of 25 U.S.C. § 607, which limits inheritance of trust property of the Yakima Tribes to enrolled members who are at least "one-fourth blood" Yakima Indi-

---

**6.** § 345 provides:
"All persons who are in whole or in part of Indian blood or descent . . . who claim to have been unlawfully denied or excluded from any allotment or any parcel of land to which they claim to be lawfully entitled by virtue of any Act of Congress, may commence and prosecute or defend any action, suit, or proceeding in relation to their right thereto in the proper district court of the United States; and said district courts are given jurisdiction to try and determine any action, suit, or proceeding arising within their respective jurisdictions involving the right of any person, in whole or in part of Indian blood or descent, to any allotment of land under any law or treaty."

**7.** In an interim order dated July 17, 1973, I invited comment from counsel on the applicability of 25 U.S.C. § 371 to plaintiff's claim. § 371 provides that under certain circumstances, illegitimate Indian children are to be considered as legitimate children for the purpose of 25 U.S.C. § 348. No claim under § 371 was made in the administrative proceedings.

My invitation to consider § 371 was premised on the assumption that 25 U.S.C. § 345 was an unqualified jurisdictional basis for plaintiff's claim. I was mistaken in that assumption. The only possible sources of jurisdiction for this action are mandamus and the APA. Neither would allow me to consider issues which were not raised in the administrative proceedings. See F.P.C. v. Colorado Interstate Gas Co., 348 U.S. 492, 499–501, 75 S.Ct. 467, 99 L.Ed. 583 (scope of review under the APA).

ans. The court held that a bar on review of the constitutional question (244 F.Supp. at 812):

> ". . . can neither be thought to be within the intent of Congress nor can it be consistent with due process. A provision requiring such a construction would be wanting in due process. [citing Ng Fund Ho v. White, 259 U.S. 276, 284–285, 42 S.Ct. 492, 66 L.Ed. 938 (1922)]"

The court upheld the constitutionality of the challenged statute and dismissed the action. The summary affirmance by the Supreme Court signifies only agreement with the result and is not authority for the construction given the finality clause by the three-judge court.[8]

The recent decision of Johnson v. Robison, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974), suggests that the Supreme Court would construe § 372 to allow review of the constitutionality of Wis.Stat. § 237.06 as incorporated in 25 U.S.C. §§ 348, 464. The plaintiff in *Johnson* sought to challenge on First and Fifth Amendment grounds the denial of veterans' educational benefits to conscientious objectors who had performed alternative service. The defendants claimed that the federal courts were barred from deciding the constitutional question by 38 U.S.C. § 211(a), which provides:

> ". . . [T]he decisions of the Administrator on any question of law or fact under any law administered by the Veterans' Administration providing benefits for veterans and their dependents or survivors shall be final and conclusive and no other official or any court of the United States shall have power or jurisdiction to review any such decision by an action in the nature of mandamus or otherwise."

The Court first noted that the construction urged by defendants would raise "serious questions concerning the

---

8. The last authoritative construction of § 372 by the Supreme Court was in First Moon v. White Tail, 270 U.S. 243, 46 S.Ct. 246, 70 L.Ed. 565 (1926). *First Moon* held that the finality clause barred judicial review of an alleged misapplication of law by the Secretary of the Interior in administering the estate of an Indian who died intestate. It viewed the finality clause as applicable to all thirty-three sections of the omnibus Indian Act of June 25, 1910. It noted that "infinite difficulties" would be created for the Secretary if the finality clause were construed to allow review of his "sundry duties . . . relative to Indian allotments" under the Act. 270 U.S. at 244, 46 S.Ct. at 246. *First Moon* did not decide whether the finality clause barred review of constitutional claims. Its rationale has little force in the present matter since constitutional challenges to Indian probate rulings are so infrequent that they could not significantly burden the Secretary's execution of his duties. I conclude that *First Moon* is not controlling here. I also note that more recent decisions which have allowed review of unlawful administrative action in the face of finality clauses raise considerable doubt as to the continuing validity of *First Moon's* holding that § 372 bars review of errors of law. *See* Oestereich v. Selective Service System, Local Bd. No. 11, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968); Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.

2d 210 (1958); Harmon v. Brucker, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958). *See generally*, Jaffe, Judicial Control of Administrative Action, chap. v (abridged ed. 1965).

*First Moon's* interpretation that the finality clause of § 372 applied to all sections of the omnibus Indian Act of June 25, 1910, was rejected in Tooahnippah v. Hickel, 397 U.S. 598, 90 S.Ct. 1316, 25 L.Ed.2d 600 (1970). *Tooahnippah* held that the Secretary's disapproval of an Indian will under 25 U.S.C. § 373 was reviewable. It observed:

> "Congress quite plainly stated that the Secretary's action under § 1 [§ 372] was not to be subject to judicial scrutiny. Similar language in § 2 [§ 373] would have made clear that Congress desired to work a like result under that section." [citation omitted]. 397 U.S. at 607, 90 S.Ct. at 1322.

This dicta on unreviewability under § 372 is employed only to contrast the silence on reviewability of § 372. It does not represent any analysis of the scope of the exclusion under § 372. The author of the Court's opinion in *Tooahnippah*, the Chief Justice, has elsewhere indicated doubts whether § 372 bars judicial review of questions of law. Hayes v. Seaton, 106 U.S.App.D.C. 126, 270 F.2d 319, 322 (1959) (Burger, J., dissenting). *Tooahnippah* provides no guidance on the present jurisdictional question.

constitutionality of § 211(a) [footnote omitted]," and that in such circumstances " 'it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question[s] may be avoided.' " 42 U.S.L.W. at 4315, quoting United States v. Thirty-seven Photographs, 402 U.S. 363, 369, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971). The Court achieved such a saving construction by reading § 211(a) in light of the presumption in favor of judicial review, the administrative practice of the Veterans Administration, and the principle that only the courts can determine the constitutionality of federal statutes. *Johnson* found that neither the text nor the legislative history of § 211(a) provided "the 'clear and convincing' evidence of congressional intent required by this Court before a statute will be construed to restrict access to judicial review. [citation omitted]" 94 S.Ct. at 1169. It also pointed out that the administrative practice of the Veterans' Administration was to disclaim authority to decide constitutional issues, and that great deference was due to the interpretation given a statute by those charged with its administration. 94 S. Ct. 1160. The Veterans' Administration policy was viewed by *Johnson* as in accord with "the principle that '[a]djudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies.' " [citation omitted] *Id. Johnson* concluded that the modifying clause "under any law administered by the Veterans' Administra-

tion" in § 211 (a) should be read as limiting the no-review provision to "decision[s] . . . made by the Administrator in the interpretation or application of a particular provision of the statute to a particular set of facts." *Id.* The challenge presented the Court was:

". . . not to any such decision of the *Administrator*, but rather to a decision of *Congress* to create a statutory class entitled to benefits that does not include I–O conscientious objectors. . . . Thus, . . . 'the questions of law presented in these proceedings arise under the Constitution, not under the statute whose validity is challenged.' [citation omitted]" *Id.*

*Johnson* held that § 211(a) was inapplicable to this challenge.

■■■ The question of jurisdiction in the present matter is closely analagous to that decided in *Johnson*. In each case, (1) the underlying dispute concerns the constitutionality of a statute which is essential to the administrative decision; (2) a construction of the review provision barring the courts from consideration of the underlying constitutional claim would raise grave doubts as to the constitutionality of that provision;[9] (3) a clear congressional purpose to bar judicial review of the constitutional question is not evident; (4) the administrative agency disclaims authority to decide the constitutional issue.[10] *Johnson* strongly suggests that I construe the finality clause of § 372 as not extending to actions challenging the constitutionality of laws regulating the

9. Plaintiff's claim to a share in her great-aunt's estate is a property interest within the protection of the Fifth Amendment. An interpretation of 25 U.S.C. § 372 which would allow the Secretary to deprive her of that interest on arguably unconstitutional grounds and would deny her review in any court of those grounds would raise a serious question as to the constitutionality of that statute. *See* Johnson v. Robison, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974) ; Battaglia v. General Motors Corporation, 169 F.2d 254, 257 (2nd Cir. 1948).

10. "We find that [Constance Eskra's] petition and supplemental letter have raised a serious constitutional challenge to the former Wisconsin statute, and that this matter has been properly certified to this Board for an immediate decision of the Department. However, the Department is without authority to declare the Wisconsin legislation unconstitutional. Only the courts have the authority to take action which runs counter to the will of the legislature. [citations omitted]"

Estate of Florence Bluesky Vessel, 1 IBIA 312, 317–318 (Sept. 27, 1972).

descent and distribution of Indian trust lands. I do so construe § 372 and, accordingly, I have jurisdiction under 5 U.S.C. § 702 (§ 10(a) of the APA) to review plaintiff's challenge to the illegitimacy classification.

### Class Action

Pursuant to Rules 23(a), (b)(2), Fed.R.Civ.P., plaintiff seeks to bring this action on behalf of the class of all illegitimate heirs who would inherit through their mothers but for Wis.Stat. § 237.06. Her prayer for relief seeks a judgment declaring § 237.06 unconstitutional and enjoining defendants from enforcing § 237.06. She also seeks a judgment declaring 25 U.S.C. §§ 348, 372, 464 unconstitutional as applied.

Since this action challenges federal statutes which incorporate Wisconsin law by reference and since all the defendants are federal officials, it would not be appropriate to allow plaintiff to maintain this action on behalf of persons other than those affected by 25 U.S.C. §§ 348, 372, 464. I will consider, however, whether a class action may be maintained on behalf of a narrower class, the class of persons who are or will be barred by 25 U.S.C. §§ 348 or 464 from inheriting through their mothers Indian Trust property situated in Wisconsin, on the ground that they were born out of lawful wedlock.

To test whether plaintiff can proceed on behalf of this class, I first apply the prerequisites to a class action set forth in Rule 23(a), Fed.R. Civ.P.:

"*Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representa-

tive parties will fairly and adequately protect the interests of the class."

(1) The Department of the Interior has not yet probated from 300 to 500 decedent estates which include Indian trust property situated in Wisconsin and which would be governed by Wis.Stat. § 237.06 as incorporated by reference in 25 U.S.C. §§ 348, 464. The number of those estates which involve illegitimate children who would inherit through their mothers, were it not for § 237.06 as incorporated in federal law, cannot be determined presently. I conclude that where the members of a class presently cannot be ascertained by reasonable diligence, nor their members accurately estimated, the purposes of Rule 23 are best served by holding that the first criterion of Rule 23(a) is satisfied. (2) The challenge to the constitutionality of a law distinguishing between legitimate and illegitimate children for purposes of intestate succession raises a question of law common to the class. (3) The legal claims of the plaintiff are representative of the claims of the class. (4) The plaintiff will fairly and adequately protect the interests of the class. I find and conclude that this action satisfies the prerequisites to a class action.

I further find and conclude that this action satisfies the criterion of Rule 23(b)(2):

"[T]he party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. . . ."

Accordingly, the action may be maintained as a Rule 23(b)(2) class action.

### The Merits

In the past six years, the Supreme Court has rendered opinions in at least five cases involving equal protection challenges to various forms of state discrimination against illegitimate children, as contrasted with legitimate children. Levy v. Louisiana, 391 U.S. 68, 88 S.Ct.

1509, 20 L.Ed.2d 436 (1968); Glona v. American Guarantee Co., 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968); Labine v. Vincent, 401 U.S. 532, 91 S.Ct. 1017, 28 L.Ed.2d 288 (1971); Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972); and Gomez v. Perez, 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973).[11] In *Levy, Glona, Weber,* and *Gomez,* the state discrimination was held to violate the equal protection clause. In *Labine,* such state discrimination was held not to violate the equal protection clause.

I consider that I am required by *Labine* to deny relief to plaintiff and her class in the present case. The reasons for this conclusion will be stated later in this opinion. However, in order to determine the proper process of decision in the present case it is necessary at the outset to discuss briefly the process of decision in *Labine.*

Although I consider the result reached in *Labine* unfortunate, the process of decision as revealed in the opinion of the Court is even more disturbing. The Court observes, correctly of course, that the power of government to control the descent and distribution of the property of decedents has long been recognized in England and the United States. It asserts that under the Constitution of the United States, this governmental power is lodged in the states. In states with statutory schemes for descent and distribution, the people have chosen to exercise this governmental power through the legislature. The opinion of the Court suggests that nothing more need be said, that a state statute regulating descent and distribution of the property of intestate decedents is invulnerable to challenge on equal protection grounds. This suggestion is strengthened by the language of the dissenting opinion of Mr. Justice Brennan, 401 U.S. at 548–549, 91 S.Ct. 1017, in which three other

members of the Court joined. And it is strengthened by the language of footnote 6 of the opinion of the Court, 401 U.S. at 536, 91 S.Ct. at 1019: *"Even if we were to apply the 'rational basis' test"* (emphasis added), the statutory classification would survive. I am aware of no standard of equal protection scrutiny less demanding than the "rational basis" test. The implication is that the statute in *Labine* was subject to no equal protection test whatever.

Under the constraint of the result reached in *Labine,* and for reasons discussed below, I am obliged to accept that the equal protection clause affords a state legislature extraordinary latitude when it exercises the peculiar function of promulgating a scheme for descent and distribution of the property of intestate decedents. But I am reluctant to accept a reading of *Labine* which would leave the state legislatures free to perform this peculiar function utterly uninhibited by the equal protection clause. I am strengthened in this reluctance by the language of the opinion in *Weber,* 406 U.S. at 170, 92 S.Ct. 1400, in which, while accepting the vitality of *Labine,* the Court pointedly engaged in a process of decision which involved the identification of the competing interests at stake in the controversy before it and an evaluation of the state's interests and of the appropriateness of the means chosen to vindicate those interests. Also, the Court seemed determined to treat *Labine* as though the Court in *Labine* had considered the competing interest of the child and of the state and had found the legitimate interest of the state adequate to meet the requirements of the equal protection clause.

■ Therefore, while mindful of the constraint still imposed upon me by the result reached in *Labine,* I consider that I may treat as an aberration the process of decision actually engaged in by the

---

11. In a sixth case, Jiminez v. Weinberger, 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974), the Court held that a provision of the Social Security Act discriminating between two classes of illegitimate children violated the equal protection guarantee embodied in the due process clause of the Fifth Amendment.

Court in *Labine*, and that *Weber*, and many other decisions of the Court in non-illegitimacy cases in recent years, require me to engage in the following process of decision: I am first to inquire whether the challenged classification is inherently suspect. If not, I am to attempt to isolate the interest or interests of the illegitimate child which are at stake, to attempt to isolate the interest or interests of the state which are at stake, to determine the standard of scrutiny to be applied to the discriminatory measure in light of these competing interests of the child and the state, and then to apply that standard of scrutiny and to decide the case.

### Suspect classification?

Plaintiff does not appear to contend that a legislative classification between legitimate and illegitimate children is inherently suspect.

Plaintiff's brief cites statistics which may indicate a disproportionately high rate of illegitimacy among Indians in Wisconsin. But there has been no showing that if illegitimate Indian children are barred from gaining interests in certain Indian lands by laws of intestate succession, those interests will pass to non-Indians. An uninformed, but practical, speculation would be that those interests would probably pass to other Indians. Thus, the case has not been made that discrimination between legitimate and illegitimate children in the laws of intestate succession is a disguised form of racial discrimination.

If free of the force of controlling precedent, I would consider most seriously, nevertheless, a contention that a legislative classification between legitimate and illegitimate children should be treated as constitutionally suspect. Illegitimate children are not responsible for their illegitimacy at birth, nor is there anything which the law permits them to initiate thereafter to gain legitimacy. The discriminatory system and the class it defines possess "the traditional indicia of suspectness: the class is . . .

saddled with such disabilities, . . . subjected to such a history of purposeful unequal treatment, . . . relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." San Antonio School District v. Rodriguez, 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973). This contention was raised in Jiminez v. Weinberger, 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974), but the Court found it unnecessary to reach the question, basing its decision instead upon the unconstitutionality of a statutory discrimination between two groups of illegitimate children. It appears, then, that the vitality of *Labine* persists. And *Labine* seems clearly to have rejected the theory that a classification between illegitimate children and legitimate children is constitutionally suspect. I am required, therefore, to proceed to isolate the competing interests at stake in this present case, to determine the appropriate standard of scrutiny, and to apply the appropriate standard.

### The interests of the illegitimate child

The plaintiff's interest here is economic: namely, the opportunity to share in the estate of a person who has chosen not to make a valid will and who is a lineal or collateral relative of the plaintiff's mother.

There lurks beneath the surface an interest which seems to transcend the economic interest: namely, the interest in a claim to the full measure of dignity and respect enjoyed by persons whose birth is legitimate. This latter interest might well be described as fundamental. In *Levy, Glona, Weber, Gomez,* and *Jiminez,* the Court has refrained from describing the interest of the illegitimate child as fundamental, and by clear and unmistakable implication *Labine* appears to have rejected such a description.

I conclude that I must treat the interest of the plaintiff simply as an economic interest.

*The interests of the state*

Clearly the state has an interest in avoiding a chaotic situation in which there is no way whatever to determine what is to become of property which had belonged to persons who have died without valid wills. Any kind of a comprehensive scheme of intestate succession, whether by common law rules or by statute, and however arbitrary and even bizarre, would vindicate this state interest. Wisconsin has undertaken to vindicate this state interest, as to real estate, by adopting a scheme of intestate descent which, as of the time of the death of Florence Bluesky Vessel, appeared in Chapter 237 of its statutes: to the children and to the lawful issue of deceased children of the decedent; if none, then to the spouse;[12] if none, then to the parents; if none, then to brothers and sisters and to the lineal descendants of deceased brothers and sisters; and so on. § 237.01, Wis.Stat. (1969).

At issue in the present case is not the constitutional validity of this overall statutory scheme of intestate descent, but rather that specific portion of the scheme which is embodied in § 237.06, in which the state excludes an illegitimate child, as contrasted with a legitimate child, from heirship in the intestate estates of lineal and collateral kindred of the child's mother. It is the state's interests in making this specific classification which must be identified. The interests of the state which have been suggested in the cases, or which suggest themselves, include:

(1) the state's interest in avoiding the necessity for difficult fact-finding which would burden its courts and probably delay final determination of ownership;

(2) the state's interest in promoting family life; and

(3) the state's interest in carrying out the presumed intentions of intestate decedents.

*The standard of scrutiny*

The interest of the plaintiff at stake here is not only strictly economic; it is relatively remote. A child's interest in sharing in the intestate estate of an aunt of the child's mother is considerably more remote and less urgent, for example, than a child's interest in financial support and maintenance from her father (*Gomez, supra*), or the interest of a family with dependent children in financial assistance under the Social Security Act (Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)), or the interest of a child in recovering damages for the wrongful death of her mother (*Levy, supra*) or in recovering workmen's compensation benefits for the death of her father. (*Weber, supra*), or the interest of a child in inheriting property from a father who has died without a will (as contrasted with inheriting property from a more distant relative) (*Labine, supra*).

Among the opinions of the Court in *Levy, Glona, Labine, Weber,* and *Gomez,* only in *Weber* is the standard of scrutiny articulated in any detail.[13] In Weber, the standard applied was whether the challenged classification bore a significant relationship to legitimate state interests. I consider a "significant relationship" test somewhat more demanding than a "rational relationship" test.

12. The entire scheme was subject to dower and curtesy. § 237.08, Wis.Stat. (1969).

13. *Levy,* 391 U.S. at 71, 88 S.Ct. at 1511 ("whether the line drawn is a rational one"). *Glona,* 391 U.S. 73, 88 S.Ct. 1515 (no standard expressed, but citation (391 U.S., at 75, 88 S.Ct. 1515) of Morey v. Doud, 354 U.S. 457, 465–466, 77 S.Ct. 1344, 1350, 1 L.Ed.2d 1485 (1957), is apparently intended as an acceptance of the test that the discrimination "must be based on differ-ences that are reasonably related to the purposes of the Act"). *Gomez,* 409 U.S. 535, 538, 93 S.Ct. 872, 35 L.Ed.2d 56 (no revelation of the standard of scrutiny employed; state may not discriminate against illegitimate children "invidiously"). As discussed above, *Labine* appears to reject any standard of scrutiny, but suggests that if any standard were to be applied, it would be the rational basis standard.

As I have said, the interest of an illegitimate child in sharing in the intestate estates of collateral and lineal kindred of the child's mother is more remote and less urgent than the interest of the illegitimate child at stake in *Weber* (participation in workmen's compensation benefits for father's death). Nevertheless, these interests are quite similar. Although it seems clear that the "compelling governmental interest" test is not to be applied, I am left uncertain whether the "rational relationship" test or the "significant relationship" test is to be applied in the present case. For reasons stated below, I find it unnecessary to make this choice.

*The present case*

The statutory classification challenged here bears no relationship—rational or significant—to the state's interest in avoiding the necessity for difficult factfinding which would burden the courts and probably delay final determination of ownership. Proof that a woman is the mother of an illegitimate child presents no greater potential difficulties than proof that she is the mother of a legitimate child.

Nor does the statutory classification bear a relationship—rational or significant—to the state's interest in promoting family life. I will assume that this is a legitimate interest of the state, although I believe that this assumption has escaped searching inquiry by the courts. I will also assume, without deciding, that deterring sexual intercourse between persons who are not married to one another is a constitutionally permissible means to further the state's interest in promoting family life. The question is whether the specific supposed deterrent embodied in the challenged classification is constitutionally permissible. An explicit statement of the deterrent theory would be: that men or women would refrain from engaging in nonmarital intercourse if they were aware that children so conceived would be barred from heirship in the estates of their mothers' parents, siblings, aunts,

uncles and other lineal and collateral kindred. *Weber* appears to be decisive on this point. If it "can [not] . . . be thought here that persons will shun illicit relations because the offspring may not one day reap the benefits of workmen's compensation" (406 U.S., at 173, 92 S.Ct., at 1405), if penalizing an illegitimate child by withholding workmen's compensation benefits from the child is "an ineffectual—as well as unjust—way of deterring the parent" from extra-marital intercourse (406 U.S., at 175, 92 S.Ct., at 1407), it seems even more clear that it cannot be thought that such deterrence will be achieved by the rather remote sanction which § 237.-06 visits upon illegitimate children.

The balance of this opinion will be directed to the nature and implications of the asserted interest of the state in carrying out the presumed intentions of intestate decedents.

When its establishes a scheme for the descent of lands, the state is performing a function which differs markedly from many other state functions. For example, the state is not deciding upon the purposes for which public funds are to be spent, as in the case of a program for public assistance to financially needy persons. Nor is the state deciding what persons may do with their lands, as in the case of laws relating to conveyances by deed or by will. Nor is the state deciding what persons are obliged to provide financial support to others, as in the case of a law requiring parents to use their private property to support their children. Nor is the state deciding whether to create a right of action in certain persons as against other persons, as in the case of suits for damages for wrongful death, or to create an administrative scheme for compensation to certain persons, as in the case of workmen's compensation.

Rather, the state is determining to whom the private ownership of lands shall pass upon the death of an owner who has not exercised his or her legal opportunity to make that determination by will. The state's power to perform

this function has ancient roots, and is extremely well-established. See Mager v. Grima, 8 How. 490, 493, 12 L.Ed. 1168 (1850); Jones v. Jones, 234 U.S. 615, 617, 34 S.Ct. 937, 58 L.Ed. 1500 (1914); Lyeth v. Hoey, 305 U.S. 188, 193, 59 S.Ct. 155, 83 L.Ed. 119 (1938); Labine v. Vincent, 401 U.S. 532, 537–538, and 544–545, 91 S.Ct. 1017, 28 L.Ed.2d 288, and Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 170, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972). In performing this perhaps unique function, the state is thought to be acting as if it stood in the shoes of those real property owners who had died without wills, as if it were making a will for them, as if it were performing an essentially private function.

> "It has been said that the passing of property upon intestacy is pursuant to a statutory will, which determines the property passing as well as the identity of the recipients, and which is considered to be such a distribution as the intestate presumably would have made had he made a will. The general policy is to follow the lead of the natural affections and to consider as most worthy the claims of those who stand nearest to the affections of the intestate." (Footnotes containing citations omitted). 23 Am.Jur.2d, Descent and Distribution, § 10, page 757.

In commenting on the pattern of descent provided in the Wisconsin statute, which embodies generally the concept of descent to "kindred of the blood," the Wisconsin Supreme Court has observed, somewhat grandly (Estate of Bradley, 185 Wis. 393, 395, 201 N.W. 973, 974 (1925):

> "From time immemorial it has been held by English-speaking peoples that the property of intestate deceased persons should descend to kindred of the blood. This is not a conclusion arrived at by application of principles of logic, but it is a tenet of justice, intuitively and generally recognized, and crystallized into forms of law by common consent. It formed the basis for the principles of descent obtaining at common law, and finds expression in the statutes of descent enacted in the various states of the Union."

In these expressions and others like them, there is an ambiguity. It is not clear whether the legislature is considered to be giving expression to a presumed consensus of the broader community, or to a presumed consensus only among those landowners who are without wills. Apparently, the consensuses among the larger community and the smaller group are supposed to coincide. In any event, the concept is usually spoken of as giving expression to the presumed intentions of intestate decedents. How the legislatures ascertain this consensus, how they arrive at their presumptions concerning the intentions of landowners who are without wills, is rather obscure. However, those notions, such as the notion of descent to kindred of the blood, which enjoy marked venerability in the law are apparently supposed to reflect abiding and widely shared popular attitudes, and this does not seem unreasonable. For legislators to depart sharply from these weathered traditions is to risk the displeasure of voters, and thus the political process may insure that at any particular time a particular state statute enunciating the rules of descent does indeed reflect a consensus of opinion within that State, including opinion generally shared by landowners who are without wills.

A corollary to the proposition that in choosing a scheme for the descent of lands the state is making a universal will for landowners who die without wills, appears to be the proposition that in performing this function the range of the state's freedom of choice approaches the range of the freedom of testamentary choice enjoyed by the landowners themselves while they live. Thus it appears that when the state performs this peculiar, quasi-private function, it is afforded extraordinary latitude by the equal protection clause.

I conclude that a state legislature is constitutionally free to em-

body in a scheme for the descent of land many discriminatory provisions, particularly those rooted in history and tradition. Unquestionably, discrimination between legitimate and illegitimate children, however distasteful and cruel it is to many of us, is so rooted, and deeply. See Jones v. Jones, 234 U.S. 615, 617, 34 S.Ct. 937, 58 L.Ed. 1500 (1914); 10 Am.Jur.2d, Bastards, § 146, pp. 948–949, § 155, pp. 957–958. It follows that the state has a legitimate interest in carrying out a presumed intent on the part of landowners without wills that none of their property is to descend to illegitimate children of the decedents' collateral or lineal kindred. The remaining question is whether the challenged classification embodied in § 237.06, Wis.Stat. (1969), is either rationally or significantly related to this legitimate state interest. The answer is clear. The challenged classification is both rationally and significantly related; it is precisely and efficiently designed to give effect to the state interest. It follows that 25 U.S.C. §§ 348, 372, and 464, insofar as they assimilate the disputed classification embodied in § 237.06, Wis.Stat. (1969), do not violate the equal protection guarantee embodied in the due process clause of the Fifth Amendment.

Two additional comments may be appropriate.

As indicated above, I consider that *Labine* controls the decision in the present case, and that the authoritative effect of *Labine* was preserved in *Weber*. I read *Labine* as a forceful recent holding with respect to the broad power of a state to enact a discrimination of the kind challenged here. I do not consider that holding to have been limited by the comment in *Labine* to the effect that the barrier to the illegitimate child there was not "insurmountable." 401 U.S., at 539, 91 S.Ct. 1017. Nor do I consider that in recognizing the continuing vitality of *Labine*, the Court in *Weber* (406 U.S. at 170, 92 S.Ct. 1400) intended to suggest that *Labine* recognized as legitimate state interests only the state's interest in the stability of land

titles and the state's interest in prompt and definitive determination of the valid ownership of property left by decedents.

Also, when a state undertakes to carry out by statute the presumed intent of landowners who are without wills, it undertakes to carry out an intent which is presumed to be generalized or universal. No provision is made in statutes embodying schemes for the descent of lands for cases in which it might be shown that the intent of a particular intestate decedent differed from the generalized intent expressed in the statute. Therefore, I consider that the result in this case is unaffected by discussion found in *Labine*, 401 U.S. at 539, 555–557, 91 S.Ct. 1017, and *Weber*, 406 U.S. at 170–171, 92 S.Ct. 1400, about the possible intent of specific decedents.

### ORDER

Upon the basis of the entire record herein, it is hereby ordered that:

1. Plaintiff's motion for summary judgment is denied.

2. Defendants' motion for summary judgment is granted, and summary judgment shall be entered dismissing this action on the merits.