524 F.2d 9
 Constance Jean Hollen ESKRA, Individually and on behalf of
all other persons similarly situated, Plaintiff-Appellant.
v.
Rogers MORTON, Individually and as Secretary of the
Interior, et al., Defendants-Appellees.
 No. 74-1906.
 United States Court of Appeals,
Seventh Circuit.
 Heard May 27, 1975.
Decided Sept. 29, 1975.
 
 Peter J. Sferrazza, Wisconsin Judicare, Inc., Wausau, Wis., for plaintiff-appellant.
 Wallace H. Johnson, Asst. Atty. Gen., Michael A. McCord, Atty., Dept. of Justice, Washington, D. C., David C. Mebane, U. S. Atty., Madison, Wis., for defendants-appellees.
 Before TUTTLE, Senior Circuit Judge,* and CUMMINGS and STEVENS, Circuit Judges.
 STEVENS, Circuit Judge.
 
 
 1
 The question presented by this case is whether the federal government may discriminate against an illegitimate Indian child when it is distributing intestate property left by a collateral heir of the plaintiff's deceased mother. More narrowly, does the holding in Labine v. Vincent, 401 U.S. 532, 91 S.Ct. 1017, 28 L.Ed.2d 288, that the State of Louisiana may discriminate against an illegitimate when distributing her deceased father's property compel a like result when the distributor is the United States and the distributee claims through her mother? We hold that it does not.
 
 
 2
 Before addressing the principal issue, we first state the undisputed facts and note our agreement with the district court's disposition of the jurisdictional and class action issues.
 
 I.
 
 3
 A Chippewa Indian named "Blue Sky" died intestate at Hayward, Wisconsin, on November 2, 1964.[1] She held an interest in Indian Trust Land in Wisconsin which, by federal statute, passed to her heirs as determined by the laws of Wisconsin.[2] She was not survived by any children, spouse, or parents. Her collateral relatives included three children of a predeceased niece, Florence. The eldest of the three, Constance, was the natural child of Florence and one Robert Kliebert, who did not marry her mother. After Constance was born, Florence married Knofel Hollen and gave birth to two more daughters.
 
 
 4
 The intestate estate of Constance's great aunt, Blue Sky, was probated by the Bureau of Indian Affairs. Applying the law of Wisconsin, as in effect on the date of Blue Sky's death, the Administrator found that Constance's two younger sisters were each entitled to a 1/30Th interest in their great aunt's estate, but that Constance was entitled to nothing. He found, however, that the claim of Constance raised a serious constitutional challenge to the Wisconsin statute which the Department was not authorized to consider.[3]
 
 
 5
 Prior to its amendment in 1971, § 237.06 of the Wisconsin Heirship Statute allowed an illegitimate child to share equally with legitimate children in the estate of their mother, but excluded the illegitimate completely from any share in the estate of any relative of the mother.[4] Thus, the illegitimate could take from, but not through, the mother's estate. This exclusion was eliminated in 1971.[5] The statute itself contains no explanation of the reasons for the pre-1971 exclusion.
 
 
 6
 Constance brought this action in the district court on her own behalf and also on behalf of all illegitimate heirs who would inherit through their mother but for § 237.06 of the Wisconsin statutes. After carefully considering the jurisdictional issue, the district court concluded that § 10(a) of the Administrative Procedure Act authorized review of the challenge to the classification based on illegitimacy.[6] This conclusion is consistent with the rationale of the Supreme Court's subsequent decision in Weinberger v. Salfi, --- U.S. ---, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), and this court's decision in Sanders v. Weinberger, 522 F.2d 1167 (7th Cir. 1975).
 
 
 7
 The district court held that the case could be maintained as a class action, but defined the class more narrowly than the description in plaintiff's complaint. Since the defendants are federal officials and plaintiff is barred by the federal statute's incorporation of Wisconsin law, the court limited the class to those persons "who are or will be (bound) by 25 U.S.C. §§ 348 (and) 464 from inheriting through their mothers Indian Trust property situated in Wisconsin, on the ground that they were born out of lawful wedlock." 380 F.Supp. at 213.
 
 
 8
 On the merits, with obvious reluctance, Judge Doyle concluded that the holding in Labine obliged him to sustain the constitutionality of the Wisconsin statute. He read Labine as allowing a state legislature extraordinary latitude in promulgating rules for the distribution of intestate property, and held that the presumed intent of a decedent to discriminate against illegitimate collateral heirs provided a sufficiently rational basis for the Wisconsin statute to withstand scrutiny under the Equal Protection Clause.
 
 II.
 
 9
 Judge Doyle read the Labine opinion as requiring him to disregard his own judgment and to treat the interest plaintiff seeks to vindicate as simply an economic interest.[7] If we accepted that premise, and if we thought the discrimination against illegitimates was no different from discrimination in favor of descendants as opposed to ascendants, for example, the mere fact that the government must make Some choice among different potential claimants to intestate property might well be sufficient to justify almost any choice, even one made at random. But plaintiff's interest is not simply economic. Plaintiff has a separate, identifiable interest in not being treated by her government as a second-class person. In our judgment that separate interest is entitled to federal recognition and protection.
 
 
 10
 The United States, as well as each of the several States, must accord every person within its jurisdiction the equal protection of the laws. Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884; Jimenez v. Weinberger, 417 U.S. 628, 637, 94 S.Ct. 2496, 41 L.Ed.2d 363. From its inception, the Federal Government has been directed to treat all its citizens as having been "created equal" in the eyes of the law.[8]
 
 
 11
 Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.
 
 
 12
 Hirabayashi v. United States, 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774. More than an economic interest is at stake in this case.
 
 
 13
 As Judge Doyle noted, the Labine holding appeared to rest on the premise that a state statute regulating the descent and distribution of the property of intestate decedents is immune from attack on equal protection grounds.[9] Even if that premise were valid, it would be intolerable to apply like reasoning in connection with an Indian's claim to equal treatment by the federal government.[10] But, not surprisingly, that premise appears to have been abandoned by the Court's later explanation of the Labine holding in its opinion in Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768. The Court there explained Labine as resting on (a) the state's interest in the prompt and definitive determination of the valid ownership of property left by decedents,[11] and (b) the absence of any insurmountable barrier to the legitimation of Ezra Vincent's natural daughter.[12] Nothing was said in either the Labine opinion itself, or in Weber, about the presumed intent of the decedent as a basis for sustaining the state's discrimination against illegitimates.[13]
 
 
 14
 In our judgment, the presumed intent of intestate decedents is an unacceptable justification for a decision by the state which the state would otherwise be unable to justify. It is unacceptable, not because it is irrational to assume that there are a significant number of private citizens who would intentionally punish children for the transgressions of their parents, but rather because such motivation on the part of the state is offensive to our concept of due process. In some communities it would not be unrealistic to assume that most decedents would discriminate in favor of, or against, members of a particular religious sect, race, political party, or perhaps even sex. But surely the state may not, for that reason alone, make comparable discriminatory choices. Just as private schools or private hospitals may place some arbitrary limits on the classes of people they will serve, so may testators make irrational choices in the distribution of their property. But when the choice is made by the government, the obligation to afford all persons equal protection of the laws arises.
 
 
 15
 In this case, by hypothesis, neither the decedent Blue Sky, nor the class of intestate decedents of which she was a member, made any decision to discriminate against illegitimates. Had such a private decision been made, presumably we would honor it.[14] But in the absence of any such private decision, we are required either to accept, or to reject, a decision which has been made by the sovereign itself.[15]
 
 
 16
 The primary reason given in Weber to explain the holding in Labine was that the state's interest in prompt and certain determinations of property ownership justified the exclusion of the plaintiff from a share of her natural father's estate. The state's interest in certainty is manifestly different in a case involving the right of an illegitimate to participate in her father's estate, than in one in which the right to share in the mother's estate, or to take through the mother, is involved. For, as Judge Doyle recognized, the problem of establishing the identity of an illegitimate child's father is, in many cases, vastly more difficult than identifying the mother.
 
 
 17
 The government does not dispute the plaintiff's observation that the serious problems in proving paternity in cases involving inheritance from the father are absent in cases involving inheritance through the mother. It points out, however, that no such problem existed in the Labine case itself, since Ezra Vincent had formally acknowledged that he was the father of the child. Nevertheless, the variety of situations in which natural fatherhood might be disputed makes it permissible to treat all cases involving fathers as distinguishable from all cases involving mothers.[16] The state interest which supported the Labine holding is not adequate, in our opinion, to support a comparable holding with respect to an illegitimate's interest in sharing in her mother's estate, or in the estate of a collateral of her mother.
 
 
 18
 The second reason given in Weber to explain the holding in Labine also lends support to a distinction between inheriting through the mother and inheriting from or through the father. The Court pointed out that in Labine there had been no insurmountable barrier to the father's legitimation of the child, whereas comparable options "were not realistically open to Henry Stokes." 406 U.S. at 171, 92 S.Ct. at 1404. We have some difficulty in evaluating the importance of the options open to the parents, since from the point of view of the child it really makes no difference whether options were non-existent or simply not exercised. But if there is constitutional significance to the kind of choice that is open to the parent, it is not unrealistic to assume that the mother faces greater practical obstacles to legitimation of her child than does the father.
 
 
 19
 We are persuaded that neither the precise holding of Labine, nor its rationale as explained in Weber, is controlling in the case before us. Judge Doyle correctly concluded that, apart from the presumed intent of the intestate decedent, there is no justification for the statutory discrimination against the plaintiff in this case. Since we hold that the Due Process Clause of the Fifth Amendment prevents the federal government from discriminating against her simply on the basis of a presumption that her great-aunt would disfavor her because of her parents' conduct, she is entitled to share equally with her sisters in the portion of Blue Sky's estate that passes through her deceased mother.
 
 
 20
 Reversed.
 
 
 21
 CUMMINGS, Circuit Judge (dissenting).
 
 
 22
 With all due respect for the view of my colleagues, I am impelled to dissent, largely for the reasons expressed by the district court in granting defendants' motion for summary judgment. Eskra v. Morton, 380 F.Supp. 205 (W.D.Wis.1974).
 
 
 23
 Plaintiff's half-sisters, Faye Gable and Ilene Hollen, each received a 1/30Th share of their great-aunt's estate. At oral argument, plaintiff's counsel stated that Constance Eskra's share in the estate, if awarded, would be approximately $33. Plaintiff was barred from any share in the estate because of 25 U.S.C. §§ 348 and 464, which incorporate by reference Wisconsin's Heirship of Illegitimates Statute, Wis.Stat. § 237.06 (1969), since repealed. (See notes 2, 4 and 5 of majority opinion).
 
 
 24
 According to the parties, there are between 300 and 500 estates involving interests in Indian trust property located in Wisconsin which have not been administered or probated by the United States Department of the Interior, where the decedents died before April 1, 1971, the effective date of the successor Wisconsin statute. Of said estates, a number involve illegitimate heirs who would inherit through their mothers except for the effect of Section 237.06 of the Wisconsin statutes. That number has not been determined. 380 F.Supp. at 208.
 
 
 25
 The Secretary of the Interior established a two-tier administrative process in Indian probate. An initial determination was first made against plaintiff's claim by a hearing examiner. An appeal was taken from his decision to the Board of Indian Appeals. That decision was also adverse to plaintiff. Estate of Florence Bluesky Vessel, 1 IBIA 312 (Sept. 27, 1972). The Board's decision is treated as the decision of the Secretary. In the district court, both parties agreed to the material facts as found in the administrative decision and therefore filed cross-motions for summary judgment.
 
 
 26
 Plaintiff asserted that 25 U.S.C. §§ 348 and 464 (note 2 of majority opinion), by incorporating Section 237.06 of the Wisconsin statutes, invidiously discriminated between legitimate and illegitimate Indian children and also invidiously discriminated between two classes of Indian children since illegitimate Indian children would be able to inherit through their mothers in some states and not in others. Consequently, the statutes were said to violate the concept of equal protection under the law guaranteed as to the states explicitly by the Fourteenth Amendment and as to the federal Government by the Due Process Clause of the Fifth Amendment. See Jimenez v. Weinberger, 417 U.S. 628, 637, 94 S.Ct. 2496, 41 L.Ed.2d 363, and cases cited therein.
 
 
 27
 The district court, in a thoughtful and thorough opinion, granted defendants' motion for summary judgment and dismissed the action on the merits. 380 F.Supp. at 219. The court first held that it had jurisdiction of the controversy under Section 10(a) of the Administrative Procedure Act, 5 U.S.C. § 702. 380 F.Supp. at 209-213. Next it held that the action could be maintained as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure. 380 F.Supp. at 213. The constitutional arguments were then resolved in favor of defendants. For the reasons given in the district court's opinion, I would affirm, while adding some discussion of my own.
 
 
 28
 With respect to the plaintiff's principal argument on appeal that Wisconsin Statute § 237.06, and therefore the incorporating federal statutes 25 U.S.C. §§ 348 and 464, violate the concept of equal protection by discriminating as to certain rights of heirship between legitimate and illegitimate children, the reasoning of the district court's opinion is sufficient. See 380 F.Supp. at 213-219.[1] Judge Doyle correctly concluded that the decision in Labine v. Vincent, 401 U.S. 532, 91 S.Ct. 1017, 28 L.Ed.2d 288, controls. In Labine the Court held that Louisiana could "discriminate" between legitimate and illegitimate children in its intestacy statutes. In recognizing that the laws of descent are historically a prerogative of the states, consigned to them by the Constitution, the Court implicitly applied a standard of "minimum rationality" to test the constitutionality of the statutes under the equal protection clause.[2] The majority upheld the statutes without embracing their philosophy, stating "We cannot say that Louisiana's policy provides a perfect or even a desirable solution or the one we would have provided for the problem of property rights of illegitimate children." 401 U.S. at 539, 91 S.Ct. at 1021. But the Justices could not conclude that the statutory scheme was irrational and therefore concluded that it must be upheld. Similarly, the Wisconsin statute at issue here may not be the wisest solution. Nonetheless it is a rational choice,[3] one having a foundation in legitimate state goals of "promoting family life and of directing the disposition of property left within the State." 401 U.S. at 536, 91 S.Ct. at 1019.
 
 
 29
 Plaintiff raises a second equal protection argument in this Court, however, which is not discussed in the district court opinion. Plaintiff asserts that 25 U.S.C. §§ 348 and 464, by incorporating the succession laws of the state where the land is located, violate the equal protection concept of the due process clause of the Fifth Amendment by discriminating between two classes of illegitimate children, those who live in states whose laws permit collateral inheritance for illegitimates and whose laws restrict such heirship rights of illegitimates.[4] On page 25 of plaintiff's main brief, this secondary equal protection argument is summarized as follows:
 
 
 30
 "In summary, the classification for purposes of inheritance contained in 25 U.S.C. §§ 348 and 464 which results in illegitimate Indian children being able to inherit through their mothers in some states but not in others is without rational basis and constitutes invidious discrimination between two classes of illegitimate Indian children in violation of the equal protection provisions of the due process clause of the Fifth Amendment to the United States Constitution."
 
 
 31
 Plaintiff's principal authority advanced for this proposition is Jimenez v. Weinberger, supra. Under the Social Security Act, one class of illegitimate children is deemed entitled to disability insurance benefits without any showing of dependency upon their disabled parent if state law permits them to inherit from the wage-earner parent, if their illegitimacy results solely from formal defects in their parents' ceremonial marriage, or if they are legitimated in accordance with state law. All other illegitimate children born after the date of disability fall into a class conclusively denied benefits. The Supreme Court held this statutory scheme violated the equal protection of the laws guaranteed by the Fifth Amendment because it was not reasonably related to the only valid federal governmental interest considered, preventing specious benefit claims, "since the potential for spurious claims is exactly the same as to both subclasses" (417 U.S. at 636, 94 S.Ct. at 2501). Here though, as explained in the opinion below, Wisconsin had a valid governmental interest in attempting to satisfy the presumed intent of an intestate decedent to exclude illegitimates (380 F.Supp. at 217-219). Since it has historically been the legitimate field of the states to provide for intestate succession, Congress could reasonably turn to state law to provide for the succession to property within the various states that belonged to intestate Indians, provided that, as here, the particular state intestacy law does not violate the equal protection clause of the Fourteenth Amendment.
 
 
 32
 Paraphrasing language from Hanover National Bank v. Moyses, 186 U.S. 181, 190, 22 S.Ct. 857, 861, 46 L.Ed. 1113, upholding the bankruptcy law provision that refers to state laws to determine exemption from creditors, the instant Congressional scheme passes constitutional muster because "The general operation of the law (here 25 U.S.C. §§ 348 and 464) is uniform although it may result in certain particulars differently in different states." The bankruptcy analogy is apt because the Constitution requires that the bankruptcy laws of Congress must be uniform. Jimenez does not hold that a federal statute would violate the equal protection clause where classes might be affected differently because of the Congressional reference to the laws of the various states. In any event, the force of plaintiff's argument is diminished because plaintiff's inheritance rights would be the same if 25 U.S.C. §§ 348 and 464 had not been enacted and state law controlled.
 
 
 33
 In sum, Congress' decision to apply the laws of the state where the land is located is uniformly applied; it creates no classes of itself. Furthermore, there are several possible rational bases for the Congressional scheme of incorporation of state law, including Congressional considerations of federalism, the interests of each state in a uniform scheme for intestate devolution of its land, and perhaps the notion that each state may be best able to discern the wishes of those who die intestate while owning land within that state. Congress has not acted without a rational basis in enacting 25 U.S.C. §§ 348 and 464. See generally, McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393.
 
 
 34
 Plaintiff's final position is that 25 U.S.C. § 371 should be interpreted to permit illegitimate Indian children to inherit through their mothers as well as their fathers.[5] The Government correctly states that the primary purpose of this statute is to provide for legitimation of the issue of two Indian parents by means of finding an Indian custom marriage. See Attocknie v. Udall, 261 F.Supp. 876, 883 (W.D.Okl.1966), reversed on other grounds, 390 F.2d 636 (10th Cir. 1968). Plaintiff has not attempted to show that her father, Robert Kliebert, was an Indian and that he and her mother "cohabited together as husband and wife according to the custom and manner of Indian life" within the purview of this statute. The settled administrative construction of the underscored portion of this statute does not permit an illegitimate Indian child to inherit through his mother. As stated in a well reasoned opinion of Warner Gardner, then Solicitor of the Department of the Interior,
 
 
 35
 "In my opinion these words cannot confer upon Isaac Thatcher a status of legitimacy which would permit him to represent his mother in this estate. These words make illegitimates the legitimate issue of their fathers for certain purposes connected with the descent of restricted Indian estates but there is nothing in the section to indicate that any modification of the State laws with respect to the rights of illegitimates to inherit from or through their mothers was intended by Congress." (58 I.D. 149 (October 14, 1942)).
 
 
 36
 Furthermore, the district court correctly held that since the issue as to 25 U.S.C. § 371 was not previously raised in the administrative proceedings, there was no jurisdiction to consider it under Section 10 of the Administrative Procedure Act, 5 U.S.C. § 702. See 380 F.Supp. at 210, n. 7.
 
 
 37
 In my view, the summary judgment for defendants should be affirmed.[6]
 
 
 
 *
 Senior Circuit Judge Elbert Parr Tuttle of the Fifth Circuit is sitting by designation
 
 
 [1]
 More precisely, she was a member of the Lac Courte Oreilles Chippewa Indian Tribe; her full name was Florence Blue Sky Vessel
 
 
 [2]
 25 U.S.C. § 348 provides in part:
 "Upon the approval of the allotments provided for in sections 331-334 of this title, by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the State or Territory where such land is located, and that at the expiration of said period the United States (shall) convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever: Provided, That the President of the United States may in any case in his discretion extend the period."
 25 U.S.C. § 464 provides:
 "Except as provided in sections 461, 462, 463, 464, 465, 466-470, 471-473, 474, 475, 476-478, and 479 of this title, no sale, devise, gift, exchange, or other transfer of restricted Indian lands or of shares in the assets of any Indian tribe or corporation organized hereunder, shall be made or approved: Provided, however, That such lands or interests may, with the approval of the Secretary of the Interior, be sold, devised, or otherwise transferred to the Indian tribe in which the lands or shares are located or from which the shares were derived or to a successor corporation; and in all instances such lands or interest shall descend or be devised, in accordance with the then existing laws of the State, or Federal laws where applicable, in which said lands are located or in which the subject matter of the corporation is located, to any member of such tribe or of such corporation or any heirs of such member * * * ."
 
 
 [3]
 See Estate of Florence Blue Sky Vessel, 1 I.B.I.A. 312, 317-318 (1972)
 
 
 [4]
 Section 237.06 provided:
 "Every illegitimate child shall be considered as heir of the person who shall, in writing signed in the presence of a competent witness, have acknowledged himself to be the father of such child or who shall be adjudged to be such father under the provisions of ss. 52.21 to 52.45, or who shall admit in open court that he is such father, and shall in all cases be considered as heir of his mother, and shall inherit his or her estate, in whole or in part, as the case may be, in the same manner as if he had been born in lawful wedlock; But he shall not be allowed to claim, as representing his father or mother any part of the estate of his or Her kindred, either lineal or collateral, unless before his death he shall have been legitimated by the marriage of his parents in the manner prescribed by law." (Emphasis added.)
 
 
 [5]
 Section 237.06 was replaced by Section 852.05 (1971), which allowed an illegitimate child to take through his mother in the same manner as a legitimate child
 
 
 [6]
 "The question of jurisdiction in the present matter is closely analagous to that decided in (Johnson v. Robison, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389). In each case, (1) the underlying dispute concerns the constitutionality of a statute which is essential to the administrative decision; (2) a construction of the review provision barring the courts from consideration of the underlying constitutional claim would raise grave doubts as to the constitutionality of that provision; (3) a clear congressional purpose to bar judicial review of the constitutional question is not evident; (4) the administrative agency disclaims authority to decide the constitutional issue. Johnson strongly suggests that I construe the finality clause of § 372 as not extending to actions challenging the constitutionality of laws regulating the descent and distribution of Indian trust lands. I do so construe § 372 and, accordingly, I have jurisdiction under 5 U.S.C. § 702 (§ 10(a) of the APA) to review plaintiff's challenge to the illegitimacy classification." Eskra v. Morton, 380 F.Supp. 205, 212-213 (W.D.Wis.1974). (Footnotes Omitted)
 
 
 [7]
 "There lurks beneath the surface an interest which seems to transcend the economic interest: namely, the interest in a claim to the full measure of dignity and respect enjoyed by persons whose birth is legitimate. This latter interest might well be described as fundamental. In Levy, Glona, Weber, Gomez, (Gomez v. Perez, 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56), and Jimenez, the Court has refrained from describing the interest of the illegitimate child as fundamental, and by clear and unmistakable implication Labine appears to have rejected such a description
 "I conclude that I must treat the interest of the plaintiff simply as an economic interest." 380 F.Supp. at 215.
 
 
 [8]
 "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness." The Declaration of Independence
 The rationale behind the prohibition against the grant of any title of nobility by the United States, see U.S.Const. art. I, § 9, clause 8, equally would prohibit the United States from attaching any badge of ignobility to a citizen at birth.
 
 
 [9]
 See 380 F.Supp. at 214
 
 
 [10]
 See Morton v. Mancari, 417 U.S. 535, 554-555, 94 S.Ct. 2474, 41 L.Ed.2d 290
 
 
 [11]
 Quoting from Judge Tate's opinion for the Court of Appeals of Louisiana, the Court stated:
 "Yet the substantial state interest in providing for 'the stability of . . . land titles and in the prompt and definitive determination of the valid ownership of property left by decedents,' Labine v. Vincent, 229 So.2d 449, 452 (La.App.1969), is absent in the case at hand." Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 170, 92 S.Ct. 1400, 1404, 31 L.Ed.2d 768.
 
 
 [12]
 See 406 U.S. at 170-171, 92 S.Ct. 1400. Although the existence of an insurmountable barrier to the acknowledgment of the child involved in Weber was a fact distinguishing Labine, it is perfectly clear that the rule of the Weber case is not limited to situations in which such an insurmountable barrier exists. The reference to this point, therefore, implies that the Court intended narrowly to limit the Labine holding
 
 
 [13]
 Significantly, in Weber the Court did not identify the state interest in rules designed to establish, protect, and strengthen family life as a basis for the decision in Labine, even though that interest had been mentioned in the Labine opinion itself, See 401 U.S. at 538, 92 S.Ct. 1400, and had provided the first justification for the statute identified by Judge Tate in his opinion for the Louisiana Court of Appeals. See Succession of Vincent, 229 So.2d 449, 452 (1970). In part II of its opinion in Weber, the Court expressly rejected that interest as justifying a discrimination against illegitimates claiming the benefits of Workmen's Compensation. See 406 U.S. at 173-174, 92 S.Ct. 1400. The existence and importance of that state interest is unquestioned. What is questionable is whether that interest is served by a statutory discrimination against an illegitimate child. There appears to be no serious claim that these laws any more than the criminal abortion statutes have been effective in forestalling the conduct which creates illegitimate children. See Roe v. Wade, 410 U.S. 113, 148, 93 S.Ct. 705, 35 L.Ed.2d 147. Moreover, even if we make the dubious assumption that the discrimination against illegitimates tends to deter parental misconduct, we do not believe that the Court would regard the punishment of innocent persons as an acceptable form of deterrence
 
 
 [14]
 Compare Evans v. Abney, 396 U.S. 435, 90 S.Ct. 628, 24 L.Ed.2d 634, with Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373
 
 
 [15]
 Note that in Labine the Court assumed that the "rules for intestate succession may or may not reflect the intent of particular parents. . . . But the choices reflected by the intestate succession statute are choices which it is within the power of the State to make." 401 U.S. at 537, 91 S.Ct. at 1020. The Court refused to "overturn the State's choice. . . . " Ibid
 
 
 [16]
 In both Levy v. Louisiana, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436, and Glona v. American Guaranty and Liability Insurance Co., 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441, the Supreme Court refused to permit the State to treat the relation between a mother and her illegitimate child as any different from her relation with a legitimate child for purposes of determining the right to sue for wrongful death
 
 
 [1]
 The district court relied principally on Labine v. Vincent, 401 U.S. 532, 91 S.Ct. 1017, 28 L.Ed.2d 288, in deciding plaintiff's principal equal protection argument. Plaintiff suggests strongly that Labine is distinguishable from the case at hand because Labine did not involve an "insurmountable barrier" to the securing of rights denied the illegitimate and the Wisconsin statute, plaintiff alleges, does create such a barrier
 It is true that the Court in Labine mentioned the absence of an "insurmountable barrier." 401 U.S. at 539, 91 S.Ct. 1017. The Court noted that the disabilities of illegitimacy in Labine could have been erased if the father had legitimatized the child by marrying the mother, thus securing the child's right to inherit. (Idem.) While I do not think the insurmountable barrier point in Labine to be crucial to the holding there, I note that the last phrase of the Wisconsin statute under attack here provides for the child born illegitimate to inherit from his parents' collateral relatives if the parents legitimatize the child by marriage in accord with Wisconsin law. Thus, even if the "insurmountable barrier" point in Labine was crucial, the Wisconsin statute's barrier is not insurmountable.
 
 
 [2]
 See McDonald v. Board of Election Commissioners, 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739, where the Court described the "minimum rationality" test by stating:
 "The distinctions drawn by a challenged statute must bear some rational relationship to a legitimate state end and will be set aside as violative of the Equal Protection Clause only if based on reasons totally unrelated to the pursuit of that goal. Legislatures are presumed to have acted constitutionally even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent, and their statutory classifications will be set aside only if no grounds can be conceived to justify them."
 
 
 [3]
 The majority argues by analogy that because the state cannot discriminate on the basis of race, religion or political affiliation in its intestacy statutes, it should not be able to discriminate on the basis of legitimacy or illegitimacy (p. 14 Supra ). The analogy is faulty: classifications based on the former criteria are constitutionally impermissible either because they impinge fundamental rights, E. g., Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169, or because they are inherently suspect, E. g., Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010. In either case, the statute is subjected to strict judicial scrutiny and must be justified by a compelling state interest. See Gunther, Forward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1 (1972); Developments in the Law Equal Protection, 82 Harv.L.Rev. 1065 (1969). As Labine demonstrates, classifications based on lineage are neither inherently irrational nor to be subjected to strict judicial scrutiny
 
 
 [4]
 For example, according to plaintiff, if Florence Vessel's land was situated in Michigan upon her death, plaintiff would inherit despite her illegitimacy, but if the great-aunt's land was located in Minnesota or Wisconsin, two other states where much Chippewa Indian restricted and trust property is located, she would not inherit
 
 
 [5]
 25 U.S.C. § 371 provides:
 "For the purpose of determining the descent of land to the heirs of any deceased Indian under the provisions of section 348 of this title, whenever any male and female Indian shall have cohabited together as husband and wife according to the custom and manner of Indian life the issue of such cohabitation shall be, for the purpose aforesaid, taken and deemed to be the legitimate issue of the Indians so living together, and Every Indian child, otherwise illegitimate, shall for such purpose be taken and deemed to be the legitimate issue of the father of such child: Provided, That the provisions of this section and sections 331, 336 and 397 of this title shall not be held or construed as to apply to the lands commonly called and known as the 'Cherokee Outlet.' " (Emphasis added.)
 
 
 [6]
 The supplemental authorities cited by plaintiff under Circuit Rule 29 have been examined without persuading me of the incorrectness of the decision below