Mabel SHANGREAU, Appellant,

v.

Bruce BABBITT, Secretary of the
United States Department of
the Interior, Appellee.

No. 94–4080.

United States Court of Appeals,
Eighth Circuit.

Submitted June 14, 1995.

Decided Oct. 4, 1995.

Rehearing Denied Jan. 4, 1996.

Charles Hanna Thomas, Mankato, Minnesota, argued for appellant.

Jacques B. Gelin, Washington, DC, argued for appellee (Robert L. Klarquist, Washington, DC, on the brief).

Before McMILLIAN, BRIGHT and LOKEN, Circuit Judges.

McMILLIAN, Circuit Judge.

Mabel Shangreau appeals from a final order entered in the District Court[1] for the District of Minnesota granting summary judgment in favor of the federal government on her claim that the definition of "heir" in the White Earth Land Settlement Act of 1985 (WELSA or the Act), as amended, 25 U.S.C. § 331 note, incorporating Minn.Stat. § 525.172 (1984) (repealed effective Jan. 1, 1987), invidiously discriminates against illegitimate[2] children in violation of the due process clause of the fifth amendment. *Shangreau v. Babbitt,* Civil No. 3-94-103 (D.Minn. Oct. 25, 1994) (memorandum opinion and order). For reversal, Shangreau argues the illegitimacy classification is not substantially related to any permissible gov-

1. The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

2. Like the parties and the district court, we use the term "illegitimate" to describe a child whose parents who were not married to one another at the time of the child's birth.

ernmental interest. For the reasons discussed below, we affirm the judgment of the district court.

The memorandum opinion of the district court contains a detailed statement of the historical background and underlying facts.

HISTORICAL BACKGROUND

A series of treaties between the Chippewa Indian Tribe and the United States led to the creation in 1879 of the White Earth Reservation in northwestern Minnesota. In 1887 Congress began breaking up Indian reservations and granting allotments or parcels of land to individual Indians through "trust patents." Indian General Allotment Act of 1887 (Dawes Act), 24 Stat. 388, codified as amended, in scattered sections, at 25 U.S.C. § 331 *et seq.* In 1889 Congress applied the allotment policy to the White Earth Reservation. Each full- or mixed-blood allottee received a trust patent under which the United States would hold the allotted land in trust for 25 years before conveying title in fee to the allottee. During the trust period each allotment was tax-exempt and could not be alienated or encumbered without the approval of the Secretary of the Department of the Interior. Over nearly 20 years the federal government issued about 8,000 allotments. Through executive orders, the trust periods applicable to most White Earth Reservation allotments were repeatedly extended.

In the Appropriation Acts of 1906 and 1907, Congress enacted the Clapp Amendment which purported to remove all restrictions on the sale, encumbrance or taxation of land allotted to adult mixed-blood Indians on the White Earth Reservation. The Clapp Amendment resulted in the rapid transfer to non-Indians of much of the reservation land from Indians who had been granted fee simple ownership. By 1909, 90% of the lands allotted to full-blood Indians had been sold or mortgaged, and 80% of reservation land was owned by non-Indians. Courts interpreting the Clapp Amendment emphasized its distinction between full- and mixed-blood Indians and concluded that the Clapp Amendment had terminated the trust relationship between the federal government and mixed-blood Indians but not that between full-blood Indians and the federal government. In 1915 an opinion of the Solicitor of the Department of the Interior agreed with this interpretation and concluded that the Department of the Interior did not have jurisdiction to determine the heirs of adult mixed-blood Chippewas after 1906 because the Clapp Amendment had terminated the trust relationship between the United States and such individuals. As a result, Minnesota state courts assumed the probate function.

However, in *Morrow v. United States,* 243 F. 854 (8th Cir.1917), this court suggested that the Clapp Amendment could not unilaterally terminate the trust relationship and thus cast doubt upon the validity of many land transfers made between 1906 and 1917. The Department of Justice had made only limited efforts to bring suit on behalf of Indians whose lands had been illegally conveyed. This lack of enforcement action continued despite successive extensions of the trust period.

The Indian Reorganization Act of 1934, 48 Stat. 984, codified as amended, in scattered sections, at 25 U.S.C. § 461 *et seq.,* extended indefinitely all trust periods then in existence. By this time, however, most of the allotments had already been sold, lost through tax forfeiture or otherwise alienated.

In the late 1970s several events forced a change in the federal government's treatment of Indian land claims. In *State v. Zay Zah,* 259 N.W.2d 580 (Minn.1977), *cert. denied,* 436 U.S. 917, 98 S.Ct. 2263, 56 L.Ed.2d 758 (1978), the Minnesota Supreme Court held that the Clapp Amendment could not unilaterally abrogate the trust status of a White Earth allotment. In 1979 the Solicitor of the Department of the Interior overruled the 1915 opinion interpreting the Clapp Amendment and directed the Department to determine the heirs of any White Earth mixed-blood Chippewa who died holding a beneficial interest in a White Earth trust allotment. The Solicitor also interpreted *State v. Zay Zah* to invalidate title acquired through tax forfeiture, state probate awards and other forms of involuntary alienation, including purchase without the approval of the Secretary of the Department of the Interior from mixed-blood Chippewas under 21 years of age. The combined effect of *State v.*

*Zay Zah* and the 1979 Solicitor's opinion was to cloud title to more than 100,000 acres in several Minnesota counties.

In 1986 Congress resolved the title problems by enacting WELSA. Under WELSA the federal government paid compensation to the heirs of the allottees in exchange for the land. WELSA directed the Secretary of the Department of the Interior to determine the allottees or heirs entitled to receive compensation and to proceed to make such heirship determinations as may be necessary to provide such notice of compensation. Section 8(c) of the Act provides that the Secretary shall accept as conclusive evidence of heirship any determination of the courts of the state of Minnesota as provided in section 5(a) of this Act. Section 5(a) deals with determination of heirs of the original allottees. In the process of developing procedures for determining who would be entitled to receive notices of compensation, the Bureau of Indian Affairs (BIA) analyzed which laws would be applicable to any heirship determinations. The BIA concluded that the laws relating to the inheritance of personal property in effect in the jurisdiction in which a decedent was domiciled on the date of death would likely be applicable. The prospect of applying the intestate succession laws of perhaps all 50 states, and possibly several foreign countries, over a period of more than 80 years prompted the BIA to request Congress to narrow the scope of the applicable laws.

On November 5, 1987, in response to the BIA request, Congress enacted the Indian Law Technical Amendments Act of 1987 (the 1987 Act), Pub.L. No. 100–153, 101 Stat. 886. Section 6(a) of the 1987 Act expanded the definition of "heir" in section 3(*l* ) of WELSA to provide:

> a person who received or was entitled to receive an allotment or interest as a result of testate or intestate succession under applicable Federal or Minnesota law, or one who is determined under section 9, by the application of the inheritance laws of Minnesota in effect on March 26, 1986 [the date of the enactment of WELSA] ..., to be entitled to receive compensation payable under section 8.

As explained by the Assistant Secretary for Indian Affairs, the effect of § 6(a) of the 1987 Act was that the Secretary could apply the laws of the Minnesota as of the date of the enactment of WELSA instead of the laws of many different jurisdictions at various points in time.

Pursuant to Minn.Stat. § 525.16(1), (4)(a), a one-third share of personal property descends to the surviving spouse and the balance of the estate descends "[i]n equal shares to the surviving children and to the issue of deceased children by right of representation." Minn.Stat. § 525.172 (1984) (repealed effective Jan. 1, 1987) (emphasis added), provided that:

> [a] child born to a mother who was not married to the child's father when the child was conceived nor when the child was born shall inherit from the mother the same as if the child was conceived or born to her while she was married, and also from the person who in writing and before a competent witness shall have declared himself to be the child's father, provided such writing or an authenticated copy thereof shall be produced in the proceeding in which it is asserted or from the person who has been determined to be the father of such child in a paternity proceeding before a court of competent jurisdiction; *but such child shall not inherit from the kindred of the father by right of representation.*

However, on May 29, 1985, the Minnesota legislature adopted the Uniform Probate Code (UPC) and repealed Minn.Stat. § 525.172 for estates of decedents dying after December 31, 1986. Act of May 29, 1985, ch. 250, § 27, 1985 Minn.Laws 851 (effective Jan. 1, 1987). The replacement statute, Minn.Stat. § 524.2–109, provides that "a person is the child of the person's parents regardless of the marital status of the parents and the parent and child relationship may be established under the parentage act, sections 257.51 to 257.74." Thus, on November 5, 1987, the date Congress passed the 1987 Act, the Minnesota inheritance law in effect on that date did not bar an illegitimate child from inheriting by right of representation through the father. However, the Minnesota inheritance law in effect on the date specified

by the 1987 Act for application of the Minnesota inheritance laws, March 26, 1986, the date of the enactment of WELSA, did bar such inheritance.[3] We turn now to the facts in the present case.

## BACKGROUND FACTS

The facts are not in dispute. In administrative proceedings to determine heirship, the administrative law judge (ALJ) determined that the original White Earth allottee of the land in question was Lizzie Pemberton Beaupre Blair (her Chippewa name was Mokah-ah-mo-aince), allottee No. 0–3420; she died on May 3, 1974. She had improperly transferred her allotment on July 30, 1908, when she was under the age of 21, and thus her heirs were entitled to compensation, with interest from the date of the taking, as of that date. Richard C. Beaupre was one of her heirs and entitled to receive a one-seventh interest in the compensation to which she would have been entitled. Richard C. Beaupre died on August 1, 1986, in Minnesota; he was survived by his second wife, Philomene E. Azure Beaupre, and their three sons. Richard C. Beaupre also had a son, Charles Roy Beaupre, from his first marriage. Charles Roy Beaupre died on March 12, 1976; he was survived only by his illegitimate son, Richard Charles Beaupre. Shangreau is his mother; she and Charles Roy Beaupre were not married at the time he was born on October 22, 1973, and they never subsequently married. However, in an affidavit of paternity signed November 1, 1973, Charles Roy Beaupre acknowledged that Richard Charles Beaupre was his son. Richard Charles Beaupre died on March 1, 1992, without descendants. It is not disputed that Richard Charles Beaupre was Charles Roy Beaupre's son and Richard C. Beaupre's grandson.

The ALJ applied Minn.Stat. § 525.172, as incorporated by the 1987 Act, and concluded that because Richard Charles Beaupre was an illegitimate child whose father had predeceased him, he could not inherit by right of representation from his paternal grandfather, Richard C. Beaupre. The ALJ also decided that she had no jurisdiction to consider the constitutionality of the Minnesota inheritance law. Shangreau appealed the heirship determination to the Interior Board of Indian Affairs (the Board). The Board affirmed the decision of the ALJ and did not consider the constitutional challenge on the ground that it lacked jurisdiction to do so. *In re WELSA Heirship Determination of Richard C. Beaupre*, 25 I.B.I.A. 133, 134 (1994). Shangreau then filed this case in federal district court.

## DISTRICT COURT DECISION

As a threshold matter, the district court held that it had subject matter jurisdiction under 28 U.S.C. § 1331 over Shangreau's constitutional challenge to the heirship determination. Slip op. at 8 & n. 8.

Shangreau first argued that on March 26, 1986, the date of the enactment of WELSA, two statutes on intestate succession, Minn. Stat. § 525.172 which barred an illegitimate child from inheritance by right of representation from the father and Minn.Stat. § 524.2–109 which did not (after establishment of the parent-child relationship), were in effect in Minnesota and that both statutes had been incorporated into WELSA by the 1987 Act. The district court, however, rejected this argument and agreed with the federal government that the only Minnesota inheritance statute in effect on March 26, 1986, the date of the enactment of WELSA, was the pre-UPC statute, Minn.Stat. § 525.172, which barred an illegitimate child from inheriting from the kindred of the father by right of representation. Slip op. at 10.

On the merits, Shangreau argued that WELSA invidiously discriminated against illegitimate children because the bar against inheritance by right of representation through the father was not substantially related to a permissible governmental interest. The district court disagreed and held that the bar against inheritance by illegitimate

---

**3.** The Secretary of the Department of the Interior has acknowledged the "harsh effect" of the former law with respect to inheritance by right of representation through the father. In 1991 the Department stated that it was considering proposing a technical amendment to WELSA to allow application of the new state law. However, according to the briefs, no such amendment has been passed at this time.

children by right of representation through the father was substantially related to interests served by WELSA. *Id.* at 16. Given the problems of identification and proof, granting heirship status to illegitimate children claiming by right of representation through the father would impose an administrative burden on the settlement process. *Id.* The district court also held that there is a logical relationship between the federal government's evident and substantial interest in accurately and efficiently settling claims to the disputed lands in Minnesota and WELSA's treatment of illegitimate children in determining their heirship status. *Id.* at 16–17. The district court granted summary judgment in favor of the federal government and dismissed Shangreau's complaint with prejudice. This appeal followed.

## JUDICIAL REVIEW

As a preliminary matter, we agree with the district court that federal courts have subject matter jurisdiction under 28 U.S.C. § 1331 to hear a constitutional challenge to Indian heirship determinations and that judicial review of constitutional claims arising from such proceedings is not barred by 25 U.S.C. § 372. *Cf. Kicking Woman v. Hodel,* 878 F.2d 1203, 1205–07 (9th Cir.1989) (constitutional challenge is an exception to 25 U.S.C. § 372's general bar to federal judicial review of merits of heirship determinations); *Eskra v. Morton,* 524 F.2d 9, 12 n. 6 (7th Cir.1975). Shangreau's constitutional challenge falls within this narrow exception to the statutory bar against judicial review.

## MERITS

Shangreau argues that the definition of heir in WELSA, which has the effect of completely barring illegitimate children from intestate inheritance by right of representation through the father, invidiously discriminates against illegitimate children, in violation of the due process clause of the fifth amendment. She argues that nothing in the text of WELSA, the 1987 Act and the legislative history indicates that Congress intended to discriminate against illegitimate children in heirship determinations. Shangreau argues that the definition of heir is not substantially related to any permissible governmental interest. She specifically distinguishes *Lalli v. Lalli,* 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978), which held a similar bar to intestate inheritance by illegitimate children from the father did not violate equal protection, on the grounds that title to land or property is not at issue in WELSA proceedings, there are no problems about identification or service of unknown illegitimate children, and there is no dispute about paternity. She also cites in support *Eskra v. Morton,* 524 F.2d at 14, which held that there was no justification for the federal government to bar an illegitimate child from inheriting by right of representation through the mother.

■ "[C]lassifications based on illegitimacy ... are invalid under the Fourteenth Amendment [and the due process clause of the fifth amendment] if they are not substantially related to permissible [governmental] interests." *Lalli v. Lalli,* 439 U.S. at 265, 99 S.Ct. at 523. In that case a state statute allowed an illegitimate child to inherit *from the father* only if the paternity of the father was declared in a judicial proceeding before the father's death. The Supreme Court held that the different treatment of paternal inheritance by illegitimate children was justified by the "peculiar problems of proof" of paternity as opposed to maternity, *id.* at 268–69, 99 S.Ct. at 524–25, and was substantially related to the important state interest in the just and orderly disposition of property at death. *Id.* at 271–75, 99 S.Ct. at 526–28.

■ Here, the federal government has an interest in the definitive and fair determination of heirship disputes so it can distribute the compensation funds and thereby extinguish any potential claims that the heirs of a White Earth allottee might have and thus clear title for innocent third parties who presently own or may own the former allotments in the future. This interest is analogous to the state's interest in the just and orderly disposition of property at death articulated in *Lalli v. Lalli,* 439 U.S. at 268, 99 S.Ct. at 524. The definition of heir in WELSA bars an illegitimate child from inheriting by right of representation *through the father* but not through the mother. As in *Lalli v. Lalli,* the peculiar problems of proof of pa-

ternity as opposed to maternity justify the different treatment of paternal inheritance by illegitimate children under WELSA. Refusing to expand heirship status to include illegitimate children claiming by right of representation through their fathers is substantially related to the federal government's important interest in accurately and efficiently settling the claims involving the White Earth Reservation allotments.

*Eskra v. Morton* supports this holding. In that case a Chippewa Indian named Blue Sky died intestate in Wisconsin in 1964. She held an interest in Indian Trust Land in Wisconsin which, by federal statute, passed to her heirs as determined by the laws of Wisconsin. She was not survived by any children, spouse or parents. Her collateral relatives included three daughters of a predeceased niece, Florence. The oldest daughter, Constance, was illegitimate; the two younger daughters were legitimate. Applying the law of Wisconsin in effect on the date of Blue Sky's death, the ALJ found that Constance's two sisters were each entitled to a share of their great-aunt's estate but that Constance was entitled to nothing. The applicable Wisconsin law allowed an illegitimate child to share equally with legitimate children in the estate of their mother and the father if the father acknowledged paternity or was adjudged to be the father, but excluded the illegitimate child from any share in the estate of any relative of either the mother or the father. Thus, the illegitimate child could inherit from, but not through, either the mother's or the father's estate. The district court upheld the statute. The court of appeals reversed.

The court of appeals noted that the state's interest in prompt and certain determinations of property ownership could justify the exclusion of an illegitimate child from a share of the father's estate, given the serious problems in proving paternity in cases involving inheritance from the father that are absent in cases involving inheritance through the mother. 524 F.2d at 14. The court of appeals further noted that "[t]he state's interest in certainty is manifestly different in a case involving the right of an illegitimate to participate in her father's estate, than in one in which the right to share in the mother's estate, or to take through the mother, is involved." *Id.* The court of appeals even suggested that "the variety of situations in which natural fatherhood might be disputed makes it permissible to treat all cases involving fathers as distinguishable from all cases involving mothers." *Id.* (footnote omitted). The court of appeals thus concluded that the state's interest in certainty did not justify the exclusion of an illegitimate child from a share of the mother's estate or in the estate of a collateral of the mother. *Id.*

*Eskra v. Morton* thus supports different treatment of inheritance through the mother and inheritance through the father. The court of appeals did not hold the statute with respect to fathers was unconstitutional. Of course, given the facts in the case, the court of appeals did not have to reach that part of the statute. Nonetheless, the analysis in *Eskra v. Morton* is consistent with our holding that the peculiar problems of proof of paternity as opposed to maternity justify the different treatment of paternal inheritance by illegitimate children.

We hold the definition of heir in WELSA does not invidiously discriminate against illegitimate children. Accordingly, we affirm the judgment of the district court.